DAVID O. COOPER,　　　　　　　　　:

　　　　Plaintiff,

　　v.　　　　　　　　　　　　　　:　　Case No. 3:13-cv-272

MONTGOMERY COUNTY, OHIO,　　　　:　　JUDGE WALTER H. RICE
et al.,

　　　　Defendants.　　　　　　　　:

---

DECISION AND ENTRY OVERRULING IN PART AND SUSTAINING IN
PART MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
MONTGOMERY COUNTY, OHIO, MAJOR DARYL WILSON AND
CAPTAIN CHUCK CROSBY (DOC. #110); OVERRULING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
DEFENDANTS MONTGOMERY COUNTY, MAJOR DARYL WILSON
AND CAPTAIN CHUCK CROSBY FOR FAILURE TO PROVIDE A
SLEEPING MATTRESS TO PLAINTIFF FOR OVER FOUR MONTHS
(DOC. #111)

---

Plaintiff, David O. Cooper, filed suit, pursuant to 42 U.S.C. § 1983, against

Montgomery County, Ohio, numerous Montgomery County Sheriff's officers, and

others, alleging that Defendants, acting under color of state law, violated his

Fourteenth Amendment substantive due process rights while he was housed as a

pretrial detainee at the Montgomery County Jail.  He also filed a claim of assault

and battery against some of the corrections officers.  All claims have been

dismissed except the § 1983 claims against Montgomery County, Major Daryl

Wilson and Captain Chuck Crosby.

This matter is currently before the Court on cross-motions for summary judgment: (1) Motion for Summary Judgment of Defendants Montgomery County, Ohio, Major Daryl Wilson, and Captain Chuck Crosby (Doc. #110) on all claims; and (2) Plaintiff's Motion for Partial Summary Judgment against Defendants Montgomery County, Major Daryl Wilson and Captain Chuck Crosby for Failure to Provide a Sleeping Mattress to Plaintiff for Over Four Months (Doc. #111).

## I.    Background and Procedural History

On February 29, 2012, David Cooper was taken to the Montgomery County Jail, where he was held as a pretrial detainee for the next eight months. He alleges that, while there, Defendants Montgomery County, Major Daryl Wilson and Captain Chuck Crosby violated his due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution by being deliberately indifferent to his serious psychiatric needs, and by subjecting him to subhuman conditions of confinement.

Cooper has a long history of mental illness. He suffers from Borderline Personality Disorder and, according to his mother, Kathy Cooper, he has engaged in self-harming behavior since he was a very young child. Doc. #113, at 12-14.[1] Upon arrival at the jail in February of 2012, Cooper was given a mental health assessment, and placed in the general jail population. In May of that year, after he

---

[1]    Kathy Cooper's deposition, Doc. #113, has no PageID numbers. Neither does Major Daryl Wilson's deposition, Doc. #106.

was caught hoarding his psychiatric medication, those drugs were discontinued for a period of time. Doc. #104, PageID##466-68. Thereafter, Cooper embarked on a path of self-destructive behavior.

On June 6, 2012, after Cooper used a plastic spoon to severely lacerate his arm and his leg, he was taken to the hospital for stitches. When he returned to the Montgomery County Jail, he was placed in an observation cell, where he spent the next four months on suicide watch. *Id.* at PageID##468-73. Because the observation cell was located in the receiving area of the jail, it was loud and hectic, and bright lights were on twenty-four hours a day. *Id.* at PageID##477, 488, 496.

Despite being placed on suicide watch, Cooper's self-destructive behavior continued in the weeks that followed. Shortly after his return from the hospital, he used a metal piece from the hospital wristband to rip out his stiches, and then shoved that metal piece into his arm. After the laceration was stapled back together, he tore out the staples and ate them. He was briefly hospitalized on other occasions after swallowing a metal door hinge pin, a battery, and a toothbrush. *Id.* at PageID##470, 474, 480, 485. Cooper also shoved paperclips into his stomach, lodged a piece of plastic up his penis, and attempted to eat his mattress. Doc. #116-2, PageID#1085.

Cooper repeatedly told the medical staff that he heard voices, and that he wanted to hurt himself. Doc. #104, PageID##506-07. On two occasions, Cooper was taken to Summit Behavioral Health, a hospital in Cincinnati, for mental health

evaluations, and then returned to the Montgomery County Jail to await trial. *Id.* at PageID##481-82; Doc. #116-2, PageID#1085.

On June 27, 2012, Kathy Cooper wrote a letter to Montgomery County Sheriff Phil Plummer, expressing her concern over the jail's failure to ensure David's safety. Doc. #116-3, PageID##1087-88. Montgomery County Jail officials, Major Daryl Wilson and Captain Chuck Crosby had taken some precautions to protect Cooper. Captain Crosby testified, however, that "we had our hands full." Doc. #116, PageID#1048. Crosby admitted that Cooper was an "extraordinary inmate" and this was "not something I had ever experienced before, trying to manage him safely." *Id.* at PageID#1067.

Crosby continually sought guidance from Samaritan Behavioral Health (SBH), the jail's mental health services provider, and from NaphCare, the contractor that provided medical care to the inmates. *Id.* Crosby testified that SBH "drove the decisionmaking" with respect to Cooper's care. *Id.* at PageID#1062. SBH employee Barb Flanagan "was very proactive" in working with Cooper. *Id.* at PageID#1067. Cooper admitted that he interacted with Flanagan on a regular basis. Doc. #104, PageID##466, 504-505.

At the recommendation of these mental health professionals, once placed on suicide watch, Cooper was no longer permitted to use eating utensils; he was given only finger foods, mostly bologna sandwiches and cookies three times a day.

He wore only a suicide gown,[2] and was forced to sleep on the bare concrete floor of his cell, with no mattress and no blanket. *Id.* at PageID##486-87. Major Wilson testified that these restrictions were necessary because Cooper "would use anything in his means to harm himself, including a mattress." Doc. #106, at 74. A suicidal inmate could rip or tear a regular mattress and use the material to injure himself. As previously noted, Cooper had attempted to eat his mattress. Doc. #116-2, PageID#1085.

Cooper testified that, without any mattress, he was "so miserable." Because it was air conditioned and the floor was cold, and because it was "super, super loud" in the receiving area of the jail, he was often unable to sleep. He sometimes slept sitting on the toilet because it was more comfortable. He testified that he repeatedly cut himself just so that he could go to the hospital to get some rest. Doc. #104, PageID##477, 488. Jail records indicate that, between mid-July and mid-August, Cooper asked jail personnel for a mattress almost every day. He threatened that, if he did not get a mattress, he would stop eating and taking his medication, and repeatedly threatened to hurt himself if his demands were not met. Doc. #116-5, PageID##1101-02, 1104, 1114.

Cooper's complaints fell on deaf ears. Mental health staff repeatedly denied his requests for a mattress, telling him that he had to get the Captain's approval. Doc. #116-5, PageID##1094-1115. Cooper repeatedly complained to Captain

---

[2]  Major Wilson described a suicide gown as an apron made of tear-resistant cloth. Doc. #106, at 49-50.

Crosby and Major Wilson about his lack of a mattress, Doc. #104, PageID##508-511, but they deferred to the recommendations of the mental health professionals. Jail personnel told him that he had "to prove that he will not harm himself" and that, if he could demonstrate that he was "able to maintain safety," then he "will earn a mat." Doc. #116-5, PageID##1093, 1106; Doc. #104, PageID#489. In the four months that Cooper was on suicide watch, he apparently never satisfied those standards.

On August 15, 2012, Kathy Cooper sent another email to Sheriff Plummer and other jail officials, complaining about David's conditions of confinement. She acknowledged their need to protect him, but pleaded with jail officials to feed him a balanced diet, and provide him with a suicide mattress, *i.e.*, one that cannot be torn or ripped, so that he could get some rest. Two days later, she sent a follow-up article on the effects of loss of sleep. She stated her belief that, if David were given a mattress, his mental state would improve considerably. Doc. #112-1, PageID#965.

Kathy Cooper testified that she also met with Major Wilson, Captain Crosby, and the jail's mental health professionals on several occasions to discuss David's conditions of confinement. Doc. #113, at 20-21, 27, 30-31. They assured her that David was being seen by mental health personnel on a regular basis, and given medical treatment as needed. *Id.* at 25. They allegedly conceded, however, that "they don't quite know how to deal with someone like David" and were "not

equipped to handle him." *Id.* at 25-26, 30. Captain Crosby told her that they "were doing the best they could." *Id.* at 29.

On August 15, 2012, Dr. Leland Johansen, a psychiatrist with NaphCare, sent a report to Captain Crosby concerning David Cooper. He opined that jail was not an appropriate setting for Cooper's treatment, given that Cooper needs constant 1:1 supervision for his own protection. He stated that Cooper has "a very high potential of killing himself if not placed in the proper psychiatric setting, as soon as reasonably possible." Doc. #116-2, PageID#1085. It does not appear that any action was taken in response to Dr. Johansen's letter.

On or about September 26, 2012, Kathy Cooper contacted Gregory Dann, the State Jail Inspector, concerning her son's conditions of confinement. Doc. #112, PageID#957. Only then was Cooper provided with a suicide mattress. *Id.* at PageID#958; Doc. #112-1, PageID#962; Doc. #104, PageID##486-87; Doc. #113, at 36-37. The record contains no evidence of any subsequent attempts by Cooper to harm himself during the rest of the time he was housed in the Montgomery County Jail. Approximately one month after being provided with a suicide mattress, he was transferred from the Montgomery County Jail to the Corrections Reception Center after being sentenced to ten years in prison.

Cooper filed his *pro se* lawsuit on August 15, 2013. Although the Court initially dismissed the case for failure to prosecute, Cooper later obtained counsel and the case was reopened. On August 17, 2015, Cooper's counsel filed a Second Amended Complaint. Doc. #74. Named defendants included Montgomery

County, Ohio, John Doe and Dr. Anthony Whitaker of Summit Behavioral Health, Captain Chuck Crosby, Major Daryl Wilson, Sergeants Curtis Laravie and Jay Vitali, and Officers Stacey Frisk, Thomas Connor, and Steven Leopold. Cooper sought relief against all Defendants under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Cooper also asserted a claim of assault and battery against Defendants Frisk, Conner, Leopold, and Laravie, stemming from a July 28, 2012, incident in which Cooper was allegedly placed in a restraint chair, pepper-sprayed and tased.

Claims against many of these Defendants have been dismissed. All that remains are the § 1983 claims asserted against Montgomery County, Captain Crosby and Major Wilson. Cooper alleges that these Defendants "enforced policies that caused Mr. Cooper's rights to be violated, failed to provide proper psychiatric medical care and endorsed improper customs at the Montgomery County Jail." Doc. #74, PageID#324.[3]

Defendants Montgomery County, Captain Crosby and Major Wilson have moved for summary judgment on all remaining claims. Doc. #110. Plaintiff has filed a cross-motion for partial summary judgment based on Defendants' failure to provide a mattress for over four months. Doc. #111.

---

[3] Cooper also alleged that Defendants Montgomery County, Wilson and Crosby "ratified their subordinate's unconstitutional conduct by failing to discipline defendant-officers or conduct a proper investigation." Doc. #74, PageID#324. This presumably refers to the incident in which officers Frisk, Conner, Leopold, and Laravie allegedly placed him in a restraint chair, tased and pepper-sprayed him. Since all claims against these officers have been dismissed, however, Defendants are entitled to summary judgment on the ratification claim.

## II.   Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the

litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." *Id.* (citations omitted).

III. **Analysis**

David Cooper seeks damages under 42 U.S.C. § 1983. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In order to recover under § 1983, a plaintiff must prove that a defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

In this case, there is no question that Montgomery County, Major Wilson and Captain Crosby were acting under color of state law when the events giving rise to Cooper's claims occurred. The only question is whether their conduct violated Cooper's constitutional rights and, if so, who is legally responsible.

Because Cooper was a pretrial detainee during the time in question, his claims are governed by the Fourteenth Amendment's substantive due process

clause rather than the Eighth Amendment's prohibition against cruel and unusual punishment. As a general rule, the same standards apply to both. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). Pretrial detainees have an additional layer of protection, however. Given that they have not been convicted of any crime, pretrial detainees may not be punished. Therefore, if a restriction or condition of confinement amounts to "punishment" of the pretrial detainee, it is unconstitutional. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). If a particular condition or restriction "is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." However, if it is not reasonably related, or if it is "excessive in relation to the alternative purpose assigned to it," it may be deemed unconstitutional. *Id.* at 538-39 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

The exact contours of Cooper's § 1983 claims against Defendants Montgomery County, Captain Crosby and Major Wilson are not entirely clear from the record. Nevertheless, he appears to allege that Defendants violated his due process rights in two ways: (1) by being deliberately indifferent to his serious psychiatric needs; and (2) by imposing conditions of confinement that deprived him of essential human needs. As noted above, Defendants have moved for summary judgment on both claims, and Cooper has moved for summary judgment on his conditions-of-confinement claim.

## A.    Official-Capacity Claims Against Wilson and Crosby

The Court turns first to the claims asserted against Major Wilson and Captain Crosby, who have been sued in their individual and official capacities. As the Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159 (1985), an individual-capacity suit seeks to impose personal liability on a government official for actions taken under color of state law. An official-capacity suit, however, is the equivalent of an action against the governmental entity of which the officer is an agent. *Id.* at 165.

Because the official-capacity claims against Wilson and Crosby are duplicative of the claims brought against Montgomery County, they will be dismissed on that basis. *See Doe v. Claiborne Cty.*, 103 F.3d 495, 509 (6th Cir. 1996) (affirming district court's dismissal of official capacity claims against school officials as duplicative of claims against county).

## B.    Individual-Capacity Claims Against Crosby and Wilson

Captain Crosby and Major Wilson were directly involved in the care of David Cooper while he was a pretrial detainee at the Montgomery County Jail. Major Wilson was the jail administrator, and Crosby was the administrative captain. Doc. #106, at 63-65. The fact that they were personally involved in the alleged wrongdoing subjects them to potential personal liability. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (noting that "proof of personal involvement is required for a supervisor to incur personal liability.").

Major Wilson and Captain Crosby argue, however, that they are entitled to qualified immunity on the § 1983 claims asserted them in their individual capacities. The doctrine of qualified immunity shields government officials from liability for civil damages for actions taken in the scope of their duties, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The doctrine operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and, "[w]hen properly applied, protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). After a defendant raises a claim of qualified immunity, the plaintiff bears the burden of rebutting it. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

To determine whether Wilson and Crosby are entitled to qualified immunity, the Court must consider: (1) whether "a constitutional right would have been violated on the facts alleged"; and (2) whether the right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. at 201. These questions need not be considered in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the

answer to either inquiry is "no," the government officials are entitled to qualified immunity.

With respect to the second inquiry, the Supreme Court has held that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

In determining whether the right is clearly established, the court looks "first to decisions of the Supreme Court," then to Sixth Circuit cases and "decisions of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although the conduct at issue in those cases need not be identical, the legal precedent "must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion" that the conduct is unlawful. *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012). *See also al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Baker v. Union Twp.*, 587 F. App'x 229, 233 (6th Cir. 2014) (noting that the right at issue cannot be defined at "a high level of generality," but neither should it be defined so narrowly to require the "circumstances of the alleged violation" to be "identical to cases already decided.").

The Court must conduct this qualified immunity analysis with respect to each of the § 1983 claims asserted against Wilson and Crosby.

### 1. Deliberate Indifference to Serious Psychiatric Needs

Cooper first alleges that Wilson and Crosby violated his substantive due process rights by being deliberately indifferent to his serious psychiatric needs. In *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), the Supreme Court held that deliberate indifference to serious medical needs of prisoners constitutes a violation of the Eighth Amendment.[4] The Sixth Circuit has held that a prisoner also has a constitutional right to medical care for serious psychological and psychiatric ailments. *See Perez v. Oakland Cty.*, 466 F.3d 416, 423 (6th Cir. 2006), and *Arrington-Bey v. Bedford Heights*, 858 F.3d 988, 2017 WL 2432389, at *3 (6th Cir. Feb. 24, 2017). In order to succeed on this claim, Cooper must show that: (1) he had a serious psychiatric need; (2) Defendants knew about it; and (3) they were deliberately indifferent to it. *Perez*, 466 F.3d at 423-24.

Defendants argue that Cooper has not offered any expert opinions or medical documentation showing the extent of his psychiatric problems but, under the circumstances presented here, this is not necessary. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir.

---

[4]    As noted above, although claims brought by pretrial detainees are governed by the Fourteenth Amendment, Eighth Amendment standards apply. *Watkins*, 272 F.3d at 685-86.

2004) (quotation omitted).  In addition to the fact that Cooper had a long history of self-destructive behavior, was diagnosed with numerous psychiatric problems, and was on several medications, his behavior while at the Montgomery County Jail leaves no doubt that he had a serious psychiatric ailment.  There is also no dispute that Wilson and Crosby were aware of Cooper's severe mental health problems. *See, e.g.*, Doc. #109-1, PageID##900-01; Doc. #116-3, PageID## 1087-88. Therefore, there is no genuine issue of material fact as to the first or second element.

At issue is whether Defendants were deliberately indifferent in failing to provide proper psychiatric care.  Cooper maintains that his psychiatric needs exceeded what could be provided at the county jail, and that Defendants should have moved him to a more appropriate facility.

"Deliberate indifference" has both objective and subjective components. From an objective standpoint, Cooper must show that the alleged deprivation was "sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation omitted).  He must also show that Wilson and Crosby had a "sufficiently culpable state of mind."  *Id.  See also Estelle*, 429 U.S. at 104-05 (noting that deliberate indifference may be manifested by prison officials "intentionally denying or delaying access to medical care.").

In support of this claim, Cooper relies heavily on Dr. Leland Johansen's August 15, 2012, report to Captain Crosby.  Doc. #116-2, PageID#1085.  As noted earlier, Dr. Johansen stated that, because Cooper needed constant 1:1

supervision, jail was not an appropriate treatment setting. He opined that Cooper had a high risk of suicide "if not placed in the proper psychiatric setting, as soon as reasonably possible." *Id.*

Even assuming that Dr. Johansen's letter supports a finding that the alleged deprivation was "objectively, sufficiently serious," no reasonable jury could find that Defendants were deliberately indifferent to Cooper's psychiatric needs. As the Supreme Court noted in *Farmer*, even when a prison official is aware of a substantial risk to an inmate's health or safety, the relevant question is whether he or she reasonably responded to that risk. 511 U.S. at 844. Here, based on the facts presented, there is no genuine issue of material fact concerning whether Defendants' response was reasonable.

When Cooper first arrived at the jail in February of 2012, he was given a mental health assessment. Doc. #104, PageID#466. He was placed in the general jail population and did quite well until early June of that year, when he cut his arm. *Id.* at PageID#469. Cooper admits that he had regular interactions with mental health personnel at the jail. *Id.* at PageID#504. Jail records from July and August of 2012 support this finding. Doc. #116-5, PageID##1092-1115.

Twice, Cooper was sent to Summit Behavioral Healthcare for mental health evaluations. Twice, he was returned to the Montgomery County Jail. In releasing Cooper from its care, Summit Behavioral Healthcare implicitly found that he was mentally stable enough to be housed at the jail while he was awaiting trial. As Dr. Johansen noted:

[b]ased on this patient's behaviour and inability, to date, to control and help him in the jail setting, he was sent to Summit Behavioral Healthcare, [], the state mental hospital "twice", and was promptly sent back to the jail, stating that the patient was a "behavioral problem" and not a severely mentally ill patient.

Doc. #116-2, PageID#1085.

Given that Cooper was a *pretrial detainee*, it is not clear what other options were available to Wilson and Crosby; they simply had to make the best of a bad situation. Major Wilson admitted in an email message that the county jail was "not designed for long-term extensive psychiatric care for inmates like David (unstable mental state and self abuse)." Doc. #109-1, PageID#901.

Crosby and Wilson each testified that they regularly consulted with Samaritan Behavioral Health ("SBH") and NaphCare about Cooper, and relied heavily on the recommendations of these mental health professionals. Doc. #116, PageID##1062, 1066-69; Doc. #106, at 30. They placed him in a cell where he could be observed 24 hours a day, and made efforts to ensure that he did not have access to anything that he could use to further harm himself.

Moreover, the record shows that, at the Montgomery County Jail, Cooper had almost daily visits with the jail's mental health professionals. The Sixth Circuit has noted the "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Notably, Dr. Johansen's letter, recommending that Cooper be transferred to a more appropriate treatment facility, was dated August 15, 2012. There is no evidence in the record indicating that, prior to that date, any mental health professional recommended that Cooper be transferred to a facility better equipped to handle his psychiatric needs. Moreover, even if Wilson and Crosby made no effort to relocate Cooper after receiving Dr. Johansen's letter, there is no evidence indicating that Cooper engaged in any further self-harming conduct between August 15, 2012, and October of 2012, when he was sentenced and moved out of the Montgomery County Jail.

Under the circumstances presented here, there is no genuine issue of material fact, because no reasonable jury could find that that Wilson and Crosby were deliberately indifferent to Cooper's psychiatric needs when they failed to transfer him to another facility. *See Conway v. Henze*, 14 F. App'x 645, 650 (7th Cir. 2001) (finding that plaintiff's claim concerning the proper treatment for his psychiatric condition "amounts to little more than a difference in opinion over how Mr. Conway should have been treated, and such disagreements do not constitute deliberate indifference."). Absent any constitutional violation, Wilson and Crosby are entitled to qualified immunity on this claim. There is no need for the Court to consider the question of whether the constitutional right at issue was clearly established.

## 2.    Unconstitutional Conditions of Confinement

Cooper also alleges that Wilson and Crosby violated his constitutional rights by subjecting him to unconstitutional conditions of confinement. According to Cooper, in their effort to keep him safe, they subjected him to subhuman conditions by making him sleep on the cold concrete floor of his cell without a mattress, and feeding him almost nothing but bologna sandwiches and cookies for approximately four months, from June through September of 2012, while he was on suicide watch.

Certainly, the Montgomery County Jail had a duty to protect Cooper from the risk of suicide. *See Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992) (holding that failure to take adequate precautions to protect against suicide may constitute deliberate indifference); *Rice v. Correctional Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").

Nevertheless, the fact that Cooper was a suicide risk does not strip him of his constitutional right to humane conditions of confinement. Conditions of confinement may be unconstitutional if they "transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Hutto v. Finney*, 437 U.S. 678, 685 (1978) (quoting *Estelle*, 429 U.S. at 102)). In *Rhodes v. Chapman*, the Supreme Court held that conditions of confinement may be unconstitutional if they "deprive inmates of the minimal civilized measure of

life's necessities." 452 U.S. 337, 347 (1981). *See also Walker v. Mintzes*, 771 F.2d 920, 925 (6th Cir. 1985) (same).

Cooper's claim that being fed bologna sandwiches and cookies three times a day for months on end deprived him of "the minimal civilized measure of life's necessities," fails on the merits. He has not established that his diet was nutritionally inadequate, and the fact that his diet was unvaried does not give rise to a constitutional violation. *See Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985). *See also White v. Marshall*, No. 2:08cv362, 2008 WL 4826282, at *9 (M.D. Ala. Oct. 21, 2008) (rejecting White's claim that being fed cold sandwiches three times a day rises to the level of a constitutional violation).

Much more problematic is Cooper's complaint is that he was forced to sleep on the concrete floor of his cell without a mattress for four months. He testified that it was difficult to sleep because the floor was very cold and uncomfortable, the air conditioning was freezing, the receiving area where his cell was located was very noisy, and the lights were on all the time. Doc. #104, PageID#488. Kathy Cooper stated that, when she visited him, he was sleep-deprived, and that the lack of sleep only exacerbated his psychiatric problems. Doc. #112, PageID#958; Doc. #112-1, PageID#965. As previously noted, jail records from July and August of 2012 show that Cooper appeared anxious and groggy, and that his speech was rambling, slow and slurred. They also document his threats to stop eating and taking his medication, and his continual threats to hurt himself if he did not get a mattress. Doc. #116-5, PageID##1097, 1102, 1104-07.

As a general rule, courts have held that short-term deprivations of a mattress pass constitutional muster. *See Harris v. Connolly*, No. 5:14-cv-128, 2016 WL 676468, at *4 (W.D.N.C. Feb. 18, 2016) (collecting cases). However, "frequent or long term deprivations" may be constitutionally problematic. *Gilland v. Owens*, 718 F. Supp. 665, 685 (W.D. Tenn. 1989). *See also Campbell v. McGruder*, 580 F.2d 521, 532 (D.C. Cir. 1978) ("the responsibilities of the jail increase as the period of the detainee's incarceration grows longer. Conditions that might be tolerable for ten days, might be unacceptable if imposed for a month or longer."); *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir. 1981) ("the length of the confinement cannot be ignored in assessing its constitutionality. Conditions unacceptable for weeks or months might be tolerable for a few days.").

At this juncture, the Court need not decide whether depriving Cooper of a mattress and forcing him to sleep on the cold concrete cell floor for approximately four months violated his constitutional rights. Even if it did, Major Wilson and Captain Crosby are still entitled to qualified immunity on this claim, because the right at issue was not clearly established.

As noted earlier, Cooper must point to binding Supreme Court or Sixth Circuit precedent (or to other decisions within the Sixth Circuit or of other federal appellate courts) with a fact pattern so similar that it would have given Wilson and Crosby "fair and clear warning" about what the law requires. *See Arrington-Bey*, 858 F.3d 988, 2017 WL 2432389, at *3 (quoting *White v. Pauly*, —U.S.—, 137 S. Ct. 548, 552 (2017)). Cooper has failed to identify any case involving the

question of whether a *suicidal* inmate can constitutionally be deprived of a mattress for several consecutive months.[5]

Cooper relies most heavily on *Gilland v. Owens*, 718 F. Supp. 2d 665 (W.D. Tenn. 1989), a case in which the court granted declaratory and injunctive relief to a group of inmates and pretrial detainees who challenged general conditions at the Shelby County Jail. With respect to the claim that new inmates were sometimes deprived of a mattress for several days, the court noted that short-term deprivations did not rise to the level of a constitutional violation, but long-term deprivations might. However, the court concluded that "[o]n this record the court cannot find that such deprivations occur with sufficient frequency or are sufficiently long term to amount to a constitutional violation." *Id.* at 685. *See also Grissom v. Davis*, 55 F. App'x 756 (6th Cir. 2003) (holding that inmate deprived of mattress for seven days failed to allege facts that, if proven, would rise to the level of a constitutional violation).

Cooper cites to a few other unpublished cases in which courts outside of the Sixth Circuit have held that inmates in the general jail population have a constitutional right to a clean mattress and sanitary living conditions. *See, e.g. Townsend v. Allen*, No. 05-cv-204, 2009 U.S. Dist. LEXIS 9911 (W.D. Wis. Feb.

---

[5] Cooper's citations to the Ohio Administrative Code sections setting forth general standards for bedding and mattresses in Ohio jails, and to the United Nations Standard Minimum Rules for Treatment of Prisoners are irrelevant to the question of whether a suicidal inmate's constitutional right to a mattress was clearly established for purposes of qualified immunity. He has not cited to any federal statute or case law that would have given Wilson and Crosby clear notice about what the law requires.

10, 2009) (upholding verdict in favor of inmate who was made to sleep on an unsanitary mattress for two months); *Hebert v. Maxwell*, 214 F. App'x 451 (5th Cir. 2007) (affirming order denying qualified immunity where plaintiff was made to sleep on the floor for two days in a cell contaminated with human waste).

Even though long-term deprivation of a mattress to an inmate in the *general* jail population may be unconstitutional, that does not necessarily mean that long-term deprivation of a mattress to an *actively suicidal* inmate is equally unconstitutional. Notably, none of the cases cited by Cooper involved a suicidal inmate. When an inmate is suicidal, the jail's duty to protect the inmate from harm must be taken into consideration in determining whether the conditions of confinement are constitutional. *Compare Littlefield v. Deland*, 641 F.2d 729 (10th Cir. 1981) (concluding that jail officials violated constitutional rights of a *mentally-ill but non-suicidal* pretrial detainee who was forced to sleep naked on concrete floor for 56 days) *with McMahon v. Beard*, 583 F.2d 172 (5th Cir. 1978) (concluding that *actively suicidal* pretrial detainee deprived of mattress and clothing for 90 days could not establish constitutional violation, and that the restrictions, which were designed to protect him, could continue for as long as the threat of suicide was present).

Because the law concerning Cooper's right to a mattress was not clearly established, Major Wilson and Captain Crosby are entitled to qualified immunity on this claim. Accordingly, all claims brought against Wilson and Crosby in their individual capacities are dismissed with prejudice.

25

## C.    Claims Against Montgomery County

Cooper also seeks to hold Montgomery County liable under § 1983 for the alleged violations of his constitutional rights.  To succeed on this claim, a plaintiff must prove that "(1) agents of the municipality, while acting under color of state law, (2) violated the plaintiff's constitutional rights, and (3) that a municipal policy or policy of inaction was the moving force behind the violation." *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).

Given that the Court has already held that Cooper failed to establish that Defendants violated his constitutional rights by being deliberately indifferent to his serious psychiatric needs, the only question is whether Montgomery County may be held liable on Cooper's conditions-of-confinement claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that, absent a showing of constitutional injury, a municipality cannot be liable for damages, regardless of the existence of a policy or custom).

As previously noted, it appears to be undisputed that Major Wilson and Captain Crosby were acting under color of state law during the time the events giving rise to Cooper's claims took place.  The first element is therefore satisfied.

Cooper has alleged that Defendants violated his Fourteenth Amendment rights by depriving him of a mattress, and requiring him to sleep on the cold, concrete floor of his cell for over four months, and that a Montgomery County

Sheriff's Office policy was the driving force behind the alleged constitutional violation. For the reasons set forth below, the Court finds that genuine issues of material fact preclude summary judgment in favor of *either* party on Cooper's conditions-of-confinement claim against Montgomery County.

### 1. Constitutional Violation

As discussed above, Montgomery County jail officials had a duty to keep Cooper safe, and to protect him from hurting himself. At issue in this case is whether, in their efforts to do so, they crossed constitutional boundaries by completely depriving him of a mattress for *four months*, making him sleep on a cold, concrete floor in a loud observation cell where the lights were on twenty-four hours a day and the air conditioning was freezing.

The Constitution requires that jail officials "provide humane conditions of confinement," ensuring that all inmates have "adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832. The Supreme Court has noted that "the Eighth Amendment must draw its meaning from evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346 (internal quotation omitted).[6] As previously noted, although a short-term deprivation of a mattress may pass constitutional muster, a long-term deprivation may very well be constitutionally problematic. *See Gilland*, 718 F. Supp. at 685; *Campbell*, 580 F.2d at 532; *Lareau*, 651 F.2d at 105.

---

[6]  Again, given his status as a pretrial detainee, Cooper's claims are brought under the Fourteenth Amendment, but Eighth Amendment standards apply. *Watkins*, 273 F.3d at 685-86

In determining whether Cooper's constitutional rights were violated, a factfinder must consider not only the *length* of the deprivation, but also his status as an actively suicidal inmate. In *McMahon v. Beard*, 583 F.2d 172 (5th Cir. 1978), the court affirmed the district court's decision granting summary judgment in favor of the sheriff, and rejected the plaintiff's claim that it was unconstitutional to deprive an actively-suicidal inmate of a mattress for three months. The court stated that "[i]t is reasonable that conditions to prevent self-harm can continue as long as the threat of suicide is present." The court, however, clarified that "[w]e do not hold that under no circumstances could prolonged conditions such as existed here approach a constitutional violation." *Id.* at 175. *See also Phillips v. East*, 81 F. App'x 483, 485 (5th Cir. Nov. 24, 2003) (holding that denial of a mattress and blanket, for two and one-half days, pursuant to a prison regulation denying bedding to suicidal inmates, served a "legitimate penological interest" and did not violate constitutional rights).

However, several courts have also held that long-term deprivation of a mattress to an actively-suicidal inmate may be unconstitutional. *Abila v. Funk*, 220 F. Supp. 3d 1121 (D.N.M. 2016), is instructive because it is so factually similar to Cooper's case. Mr. Abila, a mentally-ill pretrial detainee attempted suicide and engaged in other self-destructive behavior. Upon returning from the hospital after his suicide attempt, he continued to be labeled as a suicide risk. Even though he made no further overt attempts to kill himself, Abila was housed, for the next six months, in a small padded cell with no mattress, no clothes,

constant lighting, and cold blowing air. Abila filed suit, challenging his conditions of confinement as inhumane.

The court stated that it was "not convinced that suicidal detainees are entitled to less constitutional protection—or less desirable conditions—than a violent detainee." *Id.* at 1185. Moreover, even if the restrictions were imposed for the purpose of protecting Abila, they seemed "excessive" in relation to that stated purpose. *Id.* at 1186. For the six-month time period that Abila was no longer actively suicidal, the court granted summary judgment in his favor. The court found, however, that genuine issues of material fact precluded summary judgment on his claim with respect to the time during which he was actively suicidal and engaging in self-harming behavior. *Id.*

In a similar case, *Littlefield v. Deland*, 641 F.2d 729 (10th Cir. 1981), the Tenth Circuit affirmed the district court's verdict, following a bench trial, in favor of a mentally-ill pretrial detainee who, for fifty-six days, was made to sleep naked on the concrete floor of his cell. The district court had concluded that the conditions of confinement were so extreme that they amounted to punishment. *Id.* at 731-32. The Tenth Circuit agreed, stating that, "to hold a pretrial detainee under conditions of detention this extreme for such an excessive period as fifty-six days is punishment and, absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment." *Id.* at 732.

In two other unreported cases, courts held that suicidal inmates stated colorable conditions-of-confinement claims where they alleged that they had been forced to sleep on the concrete floor with no mattress. *See Hamby v. Hall*, No. 3:13-cv-181, 2013 WL 1809871 (M.D. Tenn. Apr. 29, 2013); *Erler v. Dominguez*, No. 2:09-cv-88, 2011 WL 781528 (N.D. Ind. Feb. 28, 2011).

In this Court's view, a reasonable jury could find that Montgomery County jail officials were simply trying to protect Cooper when they took his mattress away and made him sleep on the floor of the observation cell with the lights on twenty-four hours a day, and that, under the unique circumstances presented here, Cooper's conditions of confinement were not unconstitutional.

Nevertheless, genuine issues of material fact preclude summary judgment on this point. A reasonable jury could also conclude that subjecting Cooper to these conditions of confinement for *four months* crossed the line and violated his substantive due process rights. Cooper cites to the jail records showing that he was told that he had to "contract for safety," and that he could not have a mattress until he proved that he would not harm himself. Doc. #116-5, PageID##1094, 1102, 1106.

Yet, another option existed, whereby Cooper could be provided with a mattress without a risk of harm. It is undisputed that Cooper and his mother repeatedly asked Wilson and Crosby to obtain a suicide mattress for him, but the jail officials made no effort to do so. Major Wilson admitted that Cooper specifically "challenged us" to find him a suicide mattress. Wilson did not believe

that the Montgomery County Jail had one. The staff talked about purchasing one, but Wilson could not recall if they actually did. Doc. #106, at 75-76. Likewise, Captain Crosby testified that he knew that there were suicide mattresses available, but he did not remember purchasing any. Doc. #116, PageID#1070-71. Only after Cooper's mother complained to the State Jail Inspector, in late September of 2012, was Cooper finally given a suicide mattress. Doc. #104, PageID##486-87; Doc. #112, PageID#958.

Given that a suicide mattress was a viable option, a reasonable jury could find that completely depriving Cooper of a mattress for four months constituted impermissible "punishment" of a pretrial detainee. *See Bell*, 441 U.S. at 538-39 (noting that, if a restriction is unrelated to a legitimate governmental objective or is excessive in relation to the stated purpose, it may be deemed unconstitutional); *Littlefield*, 641 F.2d at 731-32.

Defendants also argue that Cooper has presented no medical evidence to support a finding that the lack of a mattress, and resulting lack of sleep, aggravated his psychiatric problems. As noted earlier, however, jail records indicate that, during this time period, Cooper continued threatening to hurt himself, and to stop eating and taking medication if he did not get a mattress. Jail records also indicate that he refused to lift his head when questions were asked, he was anxious, his speech was slow and slurred, and that he was groggy, "flat" and rambling. Doc. #116-5, PageID##1095, 1097-98, 1101-02, 1104-07, 1110-11, 1114. In addition, Kathy Cooper states in her affidavit that when she visited

David, he was "very withdrawn and sleep deprived." Doc. #112, PageID#958. Based on the jail records and Kathy Cooper's affidavit, a factfinder could reasonably conclude that the alleged constitutional deprivation exacerbated his mental health problems.

For the reasons set forth above, genuine issues of material fact preclude summary judgment in favor of either party on the question of whether Cooper's conditions of confinement were unconstitutional. The next question is whether a reasonable jury could also find that a Montgomery County policy or custom was the moving force behind the alleged constitutional violation.

### 2. Liability of Montgomery County

A governmental entity cannot be held liable under § 1983 merely because it employs an individual who engages in unconstitutional conduct. Rather, a plaintiff must prove that a policy or custom of the governmental entity was the "moving force" behind the alleged constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Such a policy or custom may consist of: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Unfortunately, Cooper does not clearly identify his theory of county liability for his conditions-of-confinement claim. His Second Amended Complaint alleges that Defendants "enforced policies that caused Mr. Cooper's rights to be violated

. . . and endorsed improper customs at the Montgomery County Jail." Doc. #74, PageID#324.

In his briefs, however, Cooper also cites the *absence* of a clearly-defined policy governing the circumstances under which an inmate can be deprived of a mattress and for how long. In addition, he makes several references to a lack of adequate training and supervision, but fails to fully develop this argument. In any event, to the extent that Cooper relies on the *absence* of a policy or on a failure to train or supervise, these claims are foreclosed by the recent Sixth Circuit decision in *Arrington-Bey v. Bedford Heights*, 858 F.3d 988, 2017 WL 2432389 (6th Cir. 2017).

In that case, the court explained that, when a constitutional injury arises directly from a municipal act—either an official policy or custom, or action taken by officials with final decision-making authority—"the violated right need not be clearly established because fault and causation obviously belong to the city." *Id.* at *5. However, when a plaintiff seeks to hold a municipality liable based on the absence of a policy, or on a failure to train, a plaintiff cannot establish the requisite deliberate indifference without showing that the allegedly violated right was clearly established. *Id.* at *5-6. Given that this Court has already held that Cooper did not have a clearly-established constitutional right to a mattress, neither the absence of a policy nor the alleged failure to train and supervise can form the basis for a claim against the county.

Moreover, in order to succeed on a failure-to-train claim, a plaintiff must usually show "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). *See also Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) ("A failure-to-train claim . . . requires a showing of 'prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that training in this particular area was deficient and likely to cause injury."). Here, Cooper has not identified any instances of prior constitutional violations.

For these reasons, to the extent that Cooper seeks to recover from the County based on the *absence* of a jail policy governing the provision of mattresses for suicidal inmates, or on a failure-to-train theory, Defendants are entitled to summary judgment.

*Arrington-Bey*, however, does not foreclose Cooper's claim that an official agency policy caused the alleged constitutional violation. True, Cooper has not identified an official Montgomery County Jail policy mandating that mattresses be taken away from suicidal inmates. In fact, Major Wilson testified that the jail has no written policy governing when a mattress may be taken from an inmate. Doc. #106, at 78.

Wilson admitted, however, that there "could be" an *unwritten* policy that came into play. He explained that "[i]f a subject is going to harm him or herself, then we need to do whatever we can to assure that doesn't happen." *Id.* He admitted that, if recommended by the mental health professionals, a suicidal

34

inmate would be deprived of a mattress and made to sleep on the floor. He also conceded that he was certain that this had happened on previous occasions, but did not know how often. *Id.* at 79-80.

As the Supreme Court noted in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 127 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). Based on Wilson's testimony, a reasonable jury could find that Montgomery County had an unwritten policy, custom or practice of depriving suicidal inmates of mattresses, and that this policy or custom, as implemented by jail personnel, was the driving force behind alleged constitutional violation.

The Court concludes that genuine issues of material fact preclude summary judgment in favor of either party on Cooper's conditions-of-confinement claim brought against Montgomery County. Accordingly, the Court OVERRULES Plaintiff's Motion for Summary Judgment Against Defendants Montgomery County, Major Daryl Wilson and Captain Chuck Crosby for Failure to Provide a Sleeping Mattress to Plaintiff for Over Four Months, Doc. #111, and OVERRULES that same portion of the Motion for Summary Judgment of Defendants Montgomery County, Ohio, Major Daryl Wilson, and Captain Chuck Crosby, Doc. #110.

## IV. Conclusion

For the reasons set forth above, the Court SUSTAINS IN PART and OVERRULES IN PART the Motion for Summary Judgment of Defendants Montgomery County Ohio, Major Daryl Wilson, and Captain Chuck Crosby, Doc. #110. Major Wilson and Captain Crosby are entitled to qualified immunity on the § 1983 claims brought against them in their individual capacities. Those claims are dismissed with prejudice. The § 1983 claims brought against Wilson and Crosby in their official capacities are dismissed as duplicative of the claims against Montgomery County.

Montgomery County is entitled to summary judgment in its favor on Cooper's § 1983 claim based on allegations that jail officials were deliberately indifferent to serious psychiatric needs. However, genuine issues of material fact preclude summary judgment in favor of either Plaintiff or Defendants on Cooper's § 1983 claim alleging unconstitutional conditions of confinement. Accordingly, Plaintiff's Motion for Partial Summary Judgment on his claim of failure to provide a mattress for over four months, as asserted against Montgomery County, Doc. #111, is OVERRULED.


Date: June 30, 2017

WALTER H. RICE
UNITED STATES DISTRICT JUDGE